*C 2*

2008R00902/SBM

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 13- 246 (JLL) |
| | : | |
| | : | |
| v. | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 287 |
| JOSE KATZ | : | 18 U.S.C. § 2 |

**I N F O R M A T I O N**

The defendant having waived in open court prosecution
by indictment, the United States Attorney for the District of New
Jersey charges:

**COUNT ONE**
**(Health Care Fraud Conspiracy)**

1. At various times relevant to this Information:

**The Defendant**

a. Defendant JOSE KATZ, M.D. ("defendant KATZ"),
resided in Closter, New Jersey and was a board-certified
cardiologist licensed to practice medicine in the States of New
Jersey and New York.

b. Defendant KATZ was the founder, Chief
Executive Officer, and sole equity-holder of Cardio-Med Services,
LLC ("Cardio-Med"), and Comprehensive Healthcare & Medical
Services, LLC ("Comprehensive Healthcare") (collectively, the
"Katz Companies"), described in more detail below.

Co-Conspirator

          c.   Mario Roncal, a co-conspirator who is not charged as a defendant herein, resided in Woodland Park, New Jersey.  Roncal had a medical degree from San Juan Bautista School of Medicine in San Juan, Puerto Rico, but was not licensed to practice medicine in New Jersey or New York.

          d.   In fact, Mario Roncal applied for but was denied a medical license in New Jersey.  Roncal was advised that he was ineligible under New Jersey law to obtain a medical license in New Jersey, both because San Juan Bautista School of Medicine was not properly accredited, and because Roncal lacked certain requirements for international medical students to be licensed in the United States.

          e.   Mario Roncal worked at the Katz Companies purportedly as a medical assistant.

          f.   In fact, Mario Roncal held himself out to patients of the Katz Companies as a licensed physician and performed functions that were permissible to be performed only by a licensed physician.

**The Katz Companies**

    g. Cardio-Med provided cardiology, internal medicine, and other medical services to individual patients. Cardio-Med had offices in Union City, New Jersey; Paterson, New Jersey; and West New York, New Jersey.

    h. Comprehensive Healthcare provided cardiology, internal medicine, and other medical services to individual patients. Comprehensive Healthcare had offices in Manhattan, New York; and Elmhurst, Queens, New York.

**Medicare, Medicaid, and Private Insurers**

    2. At all times relevant to this Information:

*Medicare*

    a. Medicare was a federal program established by the Social Security Act of 1965 to assist qualified aged, blind, and disabled individuals in paying for the cost of health care. The Medicare program worked by reimbursing health care providers for the costs of health care services and items at fixed rates.

    b. Medicare Part B provided supplemental medical insurance benefits to eligible beneficiaries for a variety of outpatient services, such as physicians' services and diagnostic testing. Medicare Part B was a "health care benefit program" as defined by federal law.

    c. Medicare Part B only paid for physicians' services, such as diagnosis, therapy, surgery, and consultations, if they were furnished by a doctor of medicine who was legally

- 3 -

authorized to practice by the state in which he or she provided the services and who was acting within the scope of his or her license.

d. Medicare "carriers" were regional companies that contracted with the government to oversee the administration and processing of Medicare policies and to serve as the primary point of contact for health care providers enrolled in the Medicare program.

e. Medicare carriers assigned Medicare billing numbers called Provider Identification Numbers ("PINs") to health care providers who enrolled in Medicare.

f. Defendant KATZ had PINs assigned by Medicare carriers for Cardio-Med's offices in New Jersey and Comprehensive Healthcare's offices in New York.

*Medicaid*

g. Medicaid was a jointly funded, federal-state health insurance program established by the Social Security Act of 1965 that provided certain health benefits to the disabled and individuals and families with low incomes and resources. Medicaid was a "health care benefit program" as defined by federal law.

*Empire Blue Cross Blue Shield*

h. Empire Blue Cross Blue Shield ("Empire BCBS") was a health insurance company offering coverage in New York State. Empire BCBS was the largest private health insurer in New

- 4 -

York. Empire BCBS was also a "health care benefit program" as defined by federal law.

*Aetna Life Insurance Company*

i. Aetna Life Insurance Company and its subsidiaries and affiliates ("Aetna") offered health insurance coverage in New York State. Aetna was also a "health care benefit program" as defined by federal law.

**Relevant Medical Terms**

3. At all times relevant to this Information:

a. **Coronary Artery Disease ("CAD")**

(i) CAD was the most common type of heart disease and occurred when the arteries that supply blood to the heart muscle became hardened and narrowed.

(ii) CAD was caused by the buildup of cholesterol and other matter, called plaque, within the arteries' inner walls. As the buildup increased, less blood flowed through the arteries, and this could lead to chest pain, blood clots, or heart attack.

(iii) Over time, CAD could weaken the heart muscle and cause heart failure or changes in the normal beating rhythm of the heart.

b. **Angina Pectoris ("Angina")**

(i) Angina was a symptom of CAD and was characterized by chest pain or discomfort that occurred when the heart muscle did not receive enough oxygen-rich blood.

     (ii) The most common form of angina was
"stable angina," which had a regular pattern and occurred when
the heart was working harder than usual.

     (iii) "Disabling angina" was a
classification of angina where a patient experienced angina
symptoms while performing everyday living activities.

    c. **Enhanced External Counterpulsation ("EECP")**

     (i) EECP was a non-invasive outpatient
treatment for angina.

     (ii) EECP involved placing the patient on a
treatment table and wrapping the patient's lower trunk and legs
in three air cuffs, similar to blood-pressure cuffs, which
inflated and deflated in synchronization with the patient's
cardiac cycle.

     (iii) A full course of EECP usually
consisted of 35 one-hour treatments.

     (iv) Medicare Part B would pay for EECP only
for those patients who were diagnosed with disabling stable
angina that was inoperable or for which surgery would be highly
risky.

## The Conspiracy

4.   From at least as early as in or about January, 2004, through in or about 2012, in the District of New Jersey, and elsewhere, the defendant,

JOSE KATZ,

did knowingly and willfully conspire and agree with Mario Roncal and others to execute a scheme and artifice to defraud health care benefit programs, namely, Medicare Part B, Medicaid, Empire BCBS, Aetna, and others, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, those health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

## Object

5.   The object of the conspiracy was for defendant KATZ, Mario Roncal, and others to enrich themselves by billing Medicare Part B, Medicaid, Empire BCBS, Aetna, and others for unnecessary tests and unnecessary procedures based on bogus diagnoses, and for medical services rendered by unlicensed practitioners.

- 7 -

## Manner and Means

6.   It was part of the conspiracy that defendant KATZ, from in or about July, 2006, through in or about February, 2009, spent more than $6 million for advertising on Spanish-language television and radio stations, which attracted hundreds of patients to the Katz Companies every day.  From in or about 2005 through in or about 2012, Medicare and Medicaid paid the Katz Companies more than $70 million for their services, which included unnecessary diagnostic testing and unnecessary prescribed treatments, as described below.

7.   It was further a part of the conspiracy that defendant KATZ ordered substantially the same battery of diagnostic tests for patients he treated, no matter the reason the patients were seeking treatment.  These diagnostic tests were performed at the Katz Companies, which enabled defendant KATZ to bill Medicare, Medicaid, and private insurers, including Empire BCBS and Aetna, for these services.

8.   It was further a part of the conspiracy that defendant KATZ instructed employees at the Katz Companies who were not physicians to order and perform diagnostic tests for patients of other physicians at the Katz Companies, which patients defendant KATZ had not examined, even when those other physicians had not ordered the tests and therefore deemed the tests unnecessary.

- 8 -

9. It was further a part of the conspiracy that defendant KATZ instructed his blood lab technician and others to order a "basic profile blood panel," which defendant KATZ personally created and which included approximately 30 tests, for every Medicare and Medicaid patient, irrespective of the reason the patient had sought medical care, whether the examining physician had ordered the panel, or whether the tests on the panel were reasonable and necessary for the treatment or diagnosis of the patient. These blood tests were performed at the Katz Companies, which enabled defendant KATZ to bill Medicare, Medicaid, and private insurers, including Empire BCBS and Aetna, for these services.

10. It was further a part of the conspiracy that defendant KATZ falsified patient charts with fictitious and boilerplate symptoms and would falsely diagnose a majority of his Medicare and Medicaid patients with angina to justify prescribing unnecessary EECP treatments for those patients. In fact, defendant KATZ prescribed EECP treatments for patients even though some of those patients had contraindications for the treatment. These EECP treatments were performed at the Katz Companies, which enabled defendant KATZ to bill Medicare, Medicaid, and private insurers, including Empire BCBS and Aetna, for these services. From in or about 2005, through in or about 2012, Medicare and Medicaid paid the Katz Companies more than approximately $15.6 million for EECP treatments.

11.   It was further a part of the conspiracy that defendant KATZ, because the Katz Companies had more patients than defendant KATZ could personally treat, ordered Mario Roncal to treat patients, knowing that Roncal was not licensed to practice medicine in New Jersey or New York.

12.   It was further a part of the conspiracy that Mario Roncal, at the direction of defendant KATZ, did:

a.   hold himself out to fellow employees and to patients as "Dr. Roncal;"

b.   examine new patients as well as defendant KATZ's follow-up patients;

c.   order diagnostic tests for patients;

d.   diagnose patients with medical conditions, diseases, and the like; and

e.   recommend and prescribe courses of treatment, including surgery, for patients.

13.   It was further a part of the conspiracy that Mario Roncal, at the direction of defendant KATZ, falsely diagnosed Medicare and Medicaid patients with angina and prescribed EECP treatments for those patients.

14.   It was further a part of the conspiracy that Mario Roncal, with the knowledge and consent of defendant KATZ, forged defendant KATZ's signature on paperwork associated with Roncal's unlawful services, including on patient charts.

15.   It was further a part of the conspiracy that defendant KATZ billed Medicare Part B and Medicaid for the services provided by Mario Roncal by submitting claims for payment to Medicare carriers using defendant KATZ's PINs as if defendant KATZ had provided the services, when in fact defendant KATZ had not provided the services and knew that Roncal had provided the services.

All in violation of Title 18, United States Code, Section 1349.

- 11 -

## COUNT TWO
## (False, Fictitious, and Fraudulent Claims
## to the Social Security Administration)

1.     The allegations set forth in paragraph 1 of Count One of this Information are re-alleged and incorporated herein.

## The Social Security Administration

2.     At all times relevant to this Information:

a.     The Social Security Administration ("SSA") was an independent agency of the United States that was, among other things, responsible for administering retirement, disability, and survivors benefit programs to eligible persons as defined by federal law and regulations, including the Social Security Act of 1935 and the Federal Insurance Contributions Act of 1939 ("FICA").

b.     Under FICA, earnings from work and the corresponding payment of federal withholding taxes for the requisite period of time entitled an employee to Social Security disability and retirement benefits.

c.     Employees reported their earnings and any payments of withholding taxes by attaching W-2 Wage and Tax Statement forms ("Forms W-2") to their annual federal income tax returns ("Forms 1040") filed with the Internal Revenue Service. These Forms W-2 were filed with the SSA through W-3 Transmittal of Wage and Tax Statements ("Forms W-3"), which were transmittals to the SSA for purposes of recording earnings and accruing future benefits.

- 12 -

d.  FICA wages, also known as "Social Security wages," were those wages subject to FICA taxes, also known as "Social Security taxes."  Employees paid Social Security taxes on their Social Security wages up to a maximum amount, which ranged between $87,900 and $106,800.

**The "No-Show" Employee**

3.  At all times relevant to this Information, A.K. was defendant KATZ's spouse and performed little or no work for the Katz Companies.

**The Scheme**

4.  At various times relevant to this Information:

a.  Defendant KATZ caused A.K. to be added to Cardio-Med's payroll, notwithstanding that A.K. did little or no work for Cardio-Med.

b.  Defendant KATZ caused to be transmitted to the SSA false Forms W-2 for calendar years 2005 through 2011 purportedly reflecting earnings from A.K.'s supposed work at Cardio-Med in an aggregate amount of approximately $1,251,604 and payment of FICA withholding taxes in connection with those earnings.

c.  The false and fraudulent Forms W-2 were transmitted by Forms W-3 to the SSA to satisfy eligibility requirements for disability and retirement benefits.

- 13 -

5.   From in or about 2006, until on or about March 14, 2012, in the District of New Jersey, and elsewhere, the defendant,

JOSE KATZ,

did make and present false claims, namely, Forms W-2 and W-3 for A.K. issued by Cardio-Med falsely representing that A.K. earned maximum Social Security wages from 2005 through 2011, for purposes of establishing eligibility for federal retirement and disability benefits, to a department and agency of the United States, namely, the Social Security Administration, knowing such claims to be false, fictitious, and fraudulent.

All in violation of Title 18, United States Code, Section 287 and Section 2.

- 14 -

## FORFEITURE ALLEGATION

1.    The allegations contained in Count One this Information
are hereby realleged and incorporated by reference for the
purpose of noticing forfeiture pursuant to Title 18, United
States Code, Section 982(a)(7).

2.    Upon conviction of the offense contrary to Title 18,
United States Code, Section 1347, in violation of Title 18,
United States Code, Section 1349, charged in Count One of this
Information, the defendant, JOSE KATZ, shall forfeit to the
United States, pursuant to Title 18, United States Code, Section
982(a)(7), all right, title, and interest in any property, real
or personal, that constitutes or is derived, directly or
indirectly, from gross proceeds traceable to the offense of
conviction.

3.    If any of the property described above, as a result of
any act or omission of the defendant:

a.    cannot be located upon the exercise of due
diligence;

b.    has been transferred or sold to, or deposited with,
a third party;

c.    has been placed beyond the jurisdiction of the
court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which
cannot be divided without difficulty, the United States shall be

- 15 -

entitled, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(a)(7), to forfeiture of any other property of the defendant, JOSE KATZ, up to the value of the property described in the preceding paragraph.


PAUL J. FISHMAN
United States Attorney

- 16 -

Criminal No. 2013-

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THE UNITED STATES OF AMERICA

vs.

JOSE KATZ

I N F O R M A T I O N

18 U.S.C. § 1349
18 U.S.C. § 287
18 U.S.C. § 2

PAUL J. FISHMAN
UNITED STATES ATTORNEY
NEWARK, NEW JERSEY

By: Scott B. McBride
Assistant U.S. Attorney
973-645-2708